¶ 21. I dissent from the decision of the majority. This case is controlled by the decision rendered by the Mississippi Supreme Court inLevine v. Standard Oil Co., 249 Miss. 651, 653, 163 So.2d 750, (1964). That case involved a claim against Standard Oil for injuries suffered by a customer of an individually run service station operating under the Standard Oil logo. The principal distinguishing feature between the case now before us and Levine is that, in this case, the connection between the distributor of the branded petroleum products offered for sale on the defendant's premises was even more tenuous than in Levine. The majority, by suggesting that a legitimate fact issue of actual agency exists in this case, simply ignores precedent that is binding on this Court.
¶ 22. In Levine, the operator of a service station leased the premises directly from Standard Oil. All of his employees wore uniforms emblazoned with the words "Standard Oil." The operator purchased his gasoline at wholesale from Standard Oil for re-sale at retail on the station premises. The premises themselves were marked by a large "Standard Oil" sign and the general appearance of the station was similar to other company-owned service stations. Id. 249 Miss. at 654, 163 So.2d at 751. Despite all of these connections, the supreme court affirmed the trial court's decision to grant Standard Oil a peremptory instruction.Id. The supreme court concluded that the station lessee and operator "was not an agent or employee of *Page 730 
Standard Oil under these facts. He was an independent contractor."Id.
¶ 23. The majority of the Court today largely ignores the striking similarities between this case and Levine and instead places substantial reliance on the 1931 case of Kisner v. Jackson, 159 Miss. 424, 132 So. 90
(1931). Kisner dealt with the question of whether a lessee of a sawmill operation was, in fact, the employee of the mill owner. That case turned largely on the fact that the mill owner (a) was, by contract, able to dictate the specifications of the mill's output, (b) was the mill's only customer, and (c) could, under the terms of the contract, pay a price for the mill's output that was equal to the costs of production together with "an adequate salary to the alleged independent contractor. . . ."Kisner, 159 Miss. at 428-30, 132 So. at 91. In that circumstance, the supreme court concluded that the alleged independent contractor was, in fact, nothing more than "a mere foreman or superintendent of the mill. . . ." Id. 159 Miss. at 430, 132 So. at 91. Those circumstances offer little helpful parallel for our analysis in this case.
¶ 24. Prior to drawing any conclusion, the Kisner Court attempted to list a number of considerations that control the question of whether a master-servant relationship or an independent contractor relationship exists. It is only by the most strained interpretation of the facts of this case that the principles enunciated in Kisner are brought to bear by the majority. Chief among those problems is the proposition that, in the case now before us, there can be no real claim that the truck stop operator acted as either a contractual agent or a contractual independent contractor as to Shell Oil, since there was no contractual relationship at all existing between the two entities. Shell's coercive power to require certain minimum standards of operation at the truck stop — the only power of control enjoyed by Shell — were assertable by Shell only against its jobber. Any enforcement of Shell's requirements against the truck stop operator could come only from the jobber.
¶ 25. By way of further example of the difficulties encountered by the majority to analyze this case under Kisner, the majority suggests that Shell Oil furnished "the means and appliances for the work" in this case. See Id. 159 Miss. at 428, 132 So. at 91. The majority reaches this conclusion by pointing out that Shell sold the station operator the fuel and related products that were, in turn, resold by the operator to the general public.
¶ 26. Furnishing the means and appliances for the work to be done is one of the time-honored means of helping to determine whether a particular laborer is or is not an employee of the beneficiary of the worker's labor. This consideration refers to the actual tools and devices used by the worker to accomplish his objective. It is a substantial misapplication of that concept, useful as the concept may be in the proper case, to attempt to stretch it so far as to say that a wholesaler engaged in an arms-length commercial transaction of selling product to a retailer for resale to the general public has furnished the "means and appliances" by which that retailer accomplishes the objectives of his business. Viewed in that light, every product wholesaler in the country bears the risk of being found to be in a principal-agent relationship with each and every customer that the wholesaler has. That is a notion that simply will not stand up to logical analysis.
¶ 27. In this case, Shell did not have any direct supervision or control over the operation of the truck stop operation. Its only right, were it convinced that its company image was suffering due to shoddy operation of the station, was to require the jobber to withdraw the Shell logo from *Page 731 
display on the premises. In Levine, the supreme court held that even the drastic remedy of termination of the lease would not, standing alone, give rise to a master-servant relationship. Levine, 249 Miss. at 655, 163 So.2d at 751.
¶ 28. Shell reserved the right to periodically inspect this business bearing Shell's logo and dispensing Shell products. It reserved the further right to impose some form of commercial sanction if the business was performing in a substandard manner that could reasonably be seen as damaging Shell's brand name. The mere fact that Shell, for the purpose of protecting the good will associated with its brand name, contractually insisted upon certain standards of operation of any enterprise desiring to advertise the fact that it sold Shell product does not constitute the right of control of the day-to-day management of a business enterprise that would give rise to principal-agent relationship.
¶ 29. By suggesting that the right of inspection, accompanied by the possibility of commercial sanctions if certain standards are not maintained, can create an issue of fact of whether an agency relationship has been created this Court, in one fell swoop, has fundamentally altered essentially every franchise operation within the State of Mississippi. I cannot endorse such a fundamental upheaval in the law of principal and agent when the long-standing precedent that binds this Court compels a different result.
¶ 30. There is no real issue of an actual principal-agent relationship in this case. The only possible justifiable issue is one of apparent agency, which could arguably be said to have been created by the prominent display of the Shell logo at the truck stop. However, just as any issues of actual agency are answered by the Levine case, so too are any questions of apparent agency since the possibility that a member of the public might incorrectly be led to believe that he was dealing with an entity owned and operated by the distributor was at least as great, if not greater, in Levine as it was in the case now before us. Yet the supreme court made clear in Levine that the mere display of brand name signage, no matter how prominent, is not sufficient to give rise to a potential claim of an apparent agency relationship where none, in fact, exists contractually. Any change in the principles enunciated in Levine
must come from a source other than this Court.
¶ 31. I would affirm the judgment of the trial court.
SOUTHWICK, P.J., MOORE AND THOMAS, JJ., JOIN THIS SEPARATE WRITTENOPINION.